# UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| ZELJKO SABO, | Case No. 2:12-cv-00503-EJL-CWD |
| Plaintiff, | **REPORT AND RECOMMENDATION** |
| v. | |
| FISKARS BRANDS, INC., dba GERBER LEGENDARY BLADES, and DOES 1 through 50, inclusive, | |
| Defendants. | |

# REPORT

## INTRODUCTION

Before the Court are several interrelated motions stemming from Defendant Fiskars Brand, Inc.'s Motion for Summary Judgment, filed on February 2, 2014. (Dkt. 66.) The later motions include Fiskars' Motion to Strike the Expert Opinions of Plaintiff Zeljko Sabo's experts, Drs. Toyama, Chisholm, and Kowell, filed on February 2, 2014 (Dkt. 68); Fiskars' Motion to Stike the Sworn Testimony Supporting Plaintiff's Opposition to Fiskars' Motion for Summary Judgment, filed on March 17, 2014 (Dkt. 79); and Fiskars' Motion to Strike the Declaration of Dr. Chisholm, filed on April 10, 2014 (Dkt. 81). The submissions span over one thousand pages of material.

Having carefully reviewed the record, and otherwise being fully advised, the Court finds that the facts and legal arguments are adequately presented in the briefs and record. In the interest of avoiding delay, and because the Court conclusively finds that the decisional process would not be significantly aided by oral argument, the motion will be decided on the record without oral argument, and the hearing set for August 20, 2014, will be vacated. Dist. Idaho L. Rule 7.1(d).

The Court recommends that Fiskars' Motion for Summary Judgment be denied. The Motions to Strike are denied as moot, as the Court did not consider the allegedly offending expert opinions and submissions in arriving at is recommendation concerning Fiskars' summary judgment motion. Rather, the evidence submitted in support of Fiskars' summary judgment motion contained the majority of the material the Court required to make its recommendation.

## FACTS[1]

This is a product liability case involving a Gerber RZ700 flashlight. Sabo's hunting partner, William Ehrmantrout, purchased two of the flashlights at the Black Sheep Sporting Goods store on Highway 95 in North Idaho, and gave one to Sabo as a birthday present near the end of August 2009. Polland Decl. Ex. A, Depo. of Ehrmantrout

---

[1] The Court finds the following facts material and undisputed or, when disputed, taken in the light most favorable to Sabo, the Plaintiff and non-moving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (recognizing the district court's obligation to construe the record in the light most favorable to the non-moving party on motion for summary judgment). Unless otherwise indicated, the facts were taken from the Statement of Facts in support of Defendant's Motion for Summary Judgment (Dkt. 66-2), and the supporting documents Defendant submitted. When citations to Defendant's supporting documentation are included, it is because Defendant omitted those statements in its statement of facts.

(Dkt. 74-3). Sabo's birthday was close at hand, on September 2.[2] When Sabo received the flashlight, he opened the package, inserted the lithium batteries that came with the flashlight, and tested it to ensure it worked. Decl. of Sabo ¶ 1 (Dkt. 74-9 at 2). Sabo used the flashlight a handful of times. *Id.*

On September 12, 2009, while working at a restaurant Sabo and his wife owned in Rathdrum, Idaho, Sabo had the flashlight in the off position in his left front pants pocket. While hunched over at the waist, one of the Gerber CR123A lithium batteries inside the flashlight vented, causing damage to the flashlight.

Sabo described seeing white or silver colored and chemical smelling fumes and smoke rising from the flashlight and around his face. Sabo felt a burning sensation around his left eye. Sabo was wearing corrective glasses at the time of the incident. Sabo suffered a burn on his left thigh, and his pants pocket had a hole burned through it. The left lens of Sabo's glasses had a scratch mark. Polland Decl. Ex. E (Dkt. 74-3 at 30).

Three witnesses were working in the restaurant at the time of the incident. Branko Tuscan, a restaurant employee, heard a "popping" sound and, upon investigating the cause, observed Sabo standing behind the cash register counter holding the flashlight in his hand. After the explosion, Tuscan described Sabo as stunned, "just standing there like---you know, like statue." Aff. of Anderson Ex. B, Tuskan Depo. at 15 (Dkt. 66-5 at 4.) Tuscan observed a hole in Sabo's pants, on the side of his left leg. Tuscan did not, however, recall that Sabo complained of any pain immediately after the incident, nor did

---

[2] Sabo's medical records indicate his birthdate is September 2, 1956.

Tuscan observe evidence of a burn or redness with respect to Sabo's eyes or face. Tuscan did not observe or smell any fumes or smoke.

Maria Sabo and Camille Lang also were working at the restaurant with Sabo on September 12. Maria Sabo describes hearing an explosion that sounded like a gun. As Maria turned around to see where the sound came from, she observed a "whole bunch of smoke coming up on my husband's body." Polland Decl. Ex. B, M. Sabo Depo. at 15 (Dkt. 74-3 at 13). Camille Lang heard the noise, too, describing it as similar to a gunshot. Lang observed smoke coming out of Sabo's left front pants pocket. Polland Decl. Ex. C, Camille Lang Depo. at 17 (Dkt. 74-3 at 20-21). After the incident, Lang swept up pieces of glass shards from the flashlight lens that had broken, and dumped the glass shards in the garbage. *Id.* at 22 (Dkt. 74-3 at 22-23). Lang remembers Sabo complaining that "something flew in his eye," and she observed that Sabo's left eye "was red and irritated" after the incident. Lang saw a burn on Sabo's left leg and the hole in Sabo's pants pocket. *Id.*

Sabo described the trauma he experienced as if something had hit him in the left eye. Sabo Decl. ¶ 3 (Dkt. 74-9 at 2). He attempted to rinse his left eye out with water. *Id.* ¶ 4. When his symptoms did not improve, on September 14, 2009, at 3:00 p.m., Sabo visited the emergency room complaining of left eye and left thigh pain. According to the emergency room notes, Sabo complained that it "feels like something is in his left eye, maybe a piece of flashlight plastic or glass." Polland Decl. Ex. F (Dkt. 74-3 at 41). Dr. Russo evaluated Sabo in the emergency room. Upon examination, Dr. Russo did not find an obvious foreign body in Sabo's left eye. Nor did Dr. Russo find evidence of hyphema,

cell, or flair, and all extraocular movements were intact, meaning he did not observe

infection or inflammation on Sabo's pupil and cornea. Dr. Russo did not note any

indication of trauma or burn on Sabo's face surrounding his left eye. Dr. Russo's initial

impression was "foreign body sensation, left eye." Polland Decl. Ex. F (Dkt. 74-3 at 34);

*See also* Aff. of Anderson Ex. D, Russo Depo. at 16 (Dkt. 66-7 at 4). Dr. Russo

prescribed antibacterial cream for the burn on Sabo's thigh, and antibiotic medication for

Sabo's left eye, and advised Sabo to follow up with an ophthalmologist if Sabo's

symptoms continued to persist. Dr. Russo had no reason to disbelieve Sabo's account of

his symptoms. Aff. of Anderson Ex. D, Russo Depo. at 21 (Dkt. 66-7 at 6).

Prior to the September 12, 2009 incident, Sabo's medical history includes a record

of trauma to his left eye. He had seen Dr. Bello, an optometrist, on November 28, 2007,

for corrective lens fitting. Dr. Bello's patient history notes indicate "history of trauma in

the left eye, with some floating vision." Dr. Bello noted a scar in the central area of the

retina in Sabo's left eye, with pigmentation around it. Aff. of Anderson Ex. E, Bello

Depo. at 12 (Dkt. 66-8 at 4). But just two days prior to the September 12, 2009 incident,

Sabo visited an optometrist for correction to his glasses. The medical records indicate his

left eye appeared normal. *See* Report of Dr. David Aizuss, Aff. of Anderson Ex. F (Dkt.

66-9 at 2).

Sabo was next seen by Dr. Corben, an optometrist, on September 16, 2009.

Medical records indicate Sabo again was complaining of left eye discomfort. Dr.

Corben's records indicated no abnormalities, and Sabo was sent for a follow up with a

retinal specialist. On September 17, 2009, Dr. Hopkins, a retinal specialist, examined

Sabo. She noted tear film debris on the left eye and dry eye. Dr. Hopkins did not note any problem with Sabo's cornea or the surrounding tissue in his left eye.

Sabo did not seek medical care for his eyes again until January of 2010, when he presented with eye irritation, but his physical findings were different. Sabo sought treatment on January 6, 2010, from Dr. Buckland, an ophthalmologist at the North Idaho Eye Institute, complaining of light sensitivity, double vision, headache, foreign body sensation, and burning in his left eye. Dr. Buckland noted abnormal tearing associated with inflammation in the left eye. Aff. of Anderson Ex. K, Toyama Depo. at 16 (Dkt. 66-14 at 5). According to Dr. Toyama, another ophthalmologist at the North Idaho Eye Institute who treated Sabo, the abnormalities regarding tearing were consistent with a chemical gas insult to the eye. *Id.* at 20, 40 (Dkt. 66-14 at 6, 11). Medical records indicate Sabo was diagnosed as suffering from meibomian gland dysfunction in both eyes, and a decreased tear lake, worse in left eye. Sabo's later examinations at the North Idaho Eye Institute occurred every month or as frequently as every two weeks thereafter, with Sabo continuing to complain of left ocular irritation. Treatment notes indicate the tear film was not as lubricating in the left eye, causing burning. Artificial tears were recommended.

Dr. Toyama's notes from his examination of Sabo on April 12, 2010, indicated Sabo was suffering from ultraviolet burns to his eyes from welding, but that Sabo's right eye appeared "okay. It was just his left eye." Aff. of Anderson Ex. K, Toyama Depo. at 52-53 (Dkt. 66-14 at 14). According to Dr. Toyama, Sabo's exposure to the battery fumes

likely caused his left eye to become more sensitive to injury and hypersensitive to external agents. *Id.*[3]

Dr. Donald Chisholm, an internist, treated Sabo on September 24, 2010, for a foot complaint. At that visit, Sabo did not present with a red eye, but Dr. Chisholm prescribed corticosteroid cream to use conservatively to the area adjacent to his left eye. Aff. of Anderson Ex. L, Chisholm Depo. at 14 (Dkt. 66-15 at 4). Dr. Chisholm treated Sabo again in January of 2011 for eye pain and red eye, which according to Dr. Chisholm's notes, "appear to be remnant from a welding exposure." *Id.* at 18 (Dkt. 66-15 at 5). At Sabo's next visit, Dr. Chisholm noted eye pain and headache. *Id.* at 22 (Dkt. 66-15 at 6). And on October 27, 2011, Dr. Chisholm noted pain involving the left side of Sabo's face, which Dr. Chisholm attributed to the progression of Sabo's symptoms over time, resulting in trigeminal neuralgia. *Id.* at 30-31 (Dkt. 66-15 at 8). Although Dr. Chisholm is of the opinion that Sabo's trigeminal neuralgia was related to a traumatic event, he did not link the syndrome to any particular event. *Id.* at 48 (Dkt. 66-15 at 12).

Sabo's complaints persisted, and symptoms in December of 2011, were remarkable for an area of erythema and dermatitis of the left lower eyelid and the left cheek. Sabo was referred for a neurological evaluation, which resulted in abnormal nerve conduction studies indicating trigeminal neuropathy on the left side. In December of

---

[3] In Fiskars' first motion to strike (Dkt. 68), Fiskars objects to the expert disclosure describing Dr. Toyama's expected testimony to include an opinion that "Mr. Sabo's condition is consistent with the effects of a flashlight battery explosion." The Court finds that the description in the expert witness disclosure is inconsistent with Dr. Toyama's actual testimony on the subject, rendered in the context of treating Sabo's eye condition. Fiskars had no objection to Dr. Toyama's opinions to the extent they were set forth in his medical records.

2011, Sabo was started on Gabapentin in an effort to improve his facial discomfort and potential left trigeminal neuralgia.

Sabo sought continued care, and treatment notes from May of 2012 from the North Idaho Eye Institute document persistent left-sided ocular irritation, which had not improved despite multiple attempts at therapy with a variety of topical antibiotics, steroid preparations, and topical Restasis drops to improve tearing. In July of 2012, Sabo was seen at the Spokane Eye clinic for evaluation. Treatment notes indicate a left coroidal nevus that had not been previously noted, diagnosed as congenital hypertrophy of the retinal pigment epithelium.

According to Plaintiff's expert Dr. Aziuss, a board certified ophthalmologist who reviewed Sabo's medical records and examined Sabo on May 23, 2013, Sabo's left eye showed a more prominent tear film than his right eye. In Dr. Aziuss's opinion,[4] given that Sabo's symptoms are "unilateral and that there was an exposure at some point in September 2009, it is possible to describe some of the causality to that exposure." (Dkt. 66-9 at 6.) However, during his deposition when asked whether the September 12, 2009 flashlight incident caused Sabo's left eye injury within a reasonable degree of ophthalmological certainty, Dr. Aziuss stated he had no way of telling that. Aff. of Anderson Ex. G, Aizuss Depo. at 49 (Dkt. 66-10 at 13). Dr. Aziuss stated also that welding, which can result in exposure to ultraviolet or infrared light, can cause redness,

---

[4] Sabo retained Dr. Aziuss as his expert, and Fiskars included Dr. Aziuss's entire report along with his deposition in support of its motion for summary judgment.

inflammation, discomfort, and tearing, symptoms similar to the ones Sabo was experiencing. *Id.* at 73 (Dkt. 66-10 at 19).

Sabo's other retained expert, neurologist Arthur Kowell, evaluated Sabo and provided an opinion regarding Sabo's left eye condition as well. Dr. Kowell's June 9, 2013 report indicates Sabo was experiencing "decreased sensation to light touch and pin over the left frontotemporal parietal scalp and left infraorbital region" of Sabo's head. Upon physical examination, Dr. Kowell found Sabo's left lower eyelid to be slightly red. According to Dr. Kowell, the September 12, 2009, flashlight incident resulted in the following injuries: 1) left eye injury; 2) left trigeminal neuropathy; 3) left trigeminal neuralgia; 4) variant of short-lasting unilateral neuralgiform headache with cranial autonomic symptoms which may evolve into a diffuse headache; and 5) burn on left thigh. Dr. Kowell is of the opinion that, based upon Sabo's subjective complaints following the flashlight incident, it is "medically probable" that Sabo's left eye injury resulted in left trigeminal neuropathy. Aff. of Anderson Ex. P, Kowell Depo. at 82, 91-93 (Dkt. 66-19 at 22, 24).

Sabo's damages expert, Karl Schulze, CPA, provided opinions regarding Sabo's alleged economic damages. In addition to owning the restaurant in Rathrdum, Idaho, Sabo's primary line of work was as a custom welder working as an independent contractor aboard luxury yachts. Mr. Schulze's calculations assume Sabo can no longer perform work as a welder as a result of Sabo's left eye injury, and he calculates Sabo's lost wages at $1,997,533.00. To arrive at that figure, Mr. Schulze examined Sabo's earnings history, tax returns, and business records from his welding work. After assuming

a growth rate and discount rate, along with offsetting the figure to account for earnings in 2009 and 2010 after the flashlight incident, Mr. Schulze determined Sabo could have worked until retirement age at age 70, and calculated the net present value of his earnings over a seventeen year period. (Dkt. 66-13 at 7).

Mr. Schulze's calculations were, in part, based upon Sabo's earnings for the remainder of 2009 and 2010 from HF Interiors, a yacht remodeling company that subcontracted for Sabo's welding work. Sabo continued to perform welding work for HF Interiors during the fourth quarter of 2009 and in early 2010. *See* Aff. of Anderson Ex. I, Biller Depo. at 57 (Dkt. 66-12 at 4). However, Sabo found that the quality of his welding work deteriorated, and that welding aggravated his condition to the point he could no longer work as a welder. Sabo Decl. ¶¶ 9-10 (Dkt. 74-9 at 4).

Other experts examined the flashlight, giving their opinions regarding why the battery vented. Dr. Samuel Levy, Ph.D., examined the flashlight on September 23, 2010. According to his examination, the lithium battery overheated due to a short circuit. In his opinion, given "with a reasonable degree of engineering certainty" based upon his experience in battery research, the battery venting was due to a short circuit caused by a loose screw bridging the positive terminal to the negative body of the flashlight. The cause of the incident was improper insertion of one holding screw into the assembly holding the bulb. Aff. of Anderson, Ex. A, Pl. Expert Report of Dr. Samuel Levy (Dkt. 66-4).

Dr. Neil Spingarn, Ph.D., another one of Sabo's experts, concurred with Dr. Levy's conclusion that a loose screw in the lamp housing caused the short circuit,

resulting in the overheating of the battery. Aff. of Anderson Ex. N (Dkt. 66-17 at 2). Dr.

Spingarn described the contents of the battery, and explained in his report that contact of

the battery contents with the eye would result in severe damage. *Id.* However, during his

examination of Sabo's glasses on August 5, 2013, Dr. Spingarn did not note any

chemicals other than some soap residue. Aff. of Anderson Ex. O, Spingarn Depo. at 45-

46 (Dkt. 66-18 at 12-13). Dr. Spingarn did not know whether the glasses had been

washed prior to receiving them for testing. Ben Nyssen, Fiskars' Manager of Product

Development, stated that a loose screw within the flashlight would be a product defect.

Polland Decl. Ex. O, Nyssen Depo. at 65 (Dkt. 74-4 at 19).

## ANALYSIS

### 1.    Summary Judgment Standard

Summary judgment is properly granted when no genuine and disputed issues of

material fact remain, and when, viewing the evidence in a light most favorable to the

non-moving party, the movant is clearly entitled to prevail as a matter of law. Fed. R.

Civ. P. 56; *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). A key purpose of

summary judgment is to "isolate and dispose of factually unsupported claims ...." *Celotex*

*Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986). It is "not a disfavored procedural

shortcut," but is instead the "principal tool[ ] by which factually insufficient claims or

defenses [can] be isolated and prevented from going to trial with the attendant

unwarranted consumption of public and private resources." *Id*. at 327. "[T]he mere

existence of some alleged factual dispute between the parties will not defeat an otherwise

properly supported motion for summary judgment; the requirement is that there be no

genuine issue of material fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986).

The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact. *Devereaux v. Abbey*, 263 F.3d 1070, 1076 (9th Cir. 2001). To carry this burden, the moving party need not introduce any affirmative evidence (such as affidavits or deposition excerpts) but may simply point out the absence of evidence to support the nonmoving party's case. *Fairbank v. Wunderman Cato Johnson*, 212 F.3d 528, 532 (9th Cir. 2000).

This shifts the burden to the non-moving party to produce evidence sufficient to support a jury verdict in its favor. *Anderson*, 477 U.S. at 256–57. The non-moving party must go beyond the pleadings and show "by [its] affidavits, or by the depositions, answers to interrogatories, or admissions on file" that a genuine issue of material fact exists. *Celotex*, 477 U.S. at 324. The Court must draw all justifiable inferences in favor of the nonmoving party, including questions of credibility and the weight to be accorded particular evidence, and must view the facts in the light most favorable to the nonmoving party. *Kaelin v. Globe Communications Corp.*, 162 F.3d 1036, 1039 (9th Cir. 1998).

The party bearing the burden of proof at trial "must establish beyond controversy every essential element of its ... claim." *S. Cal. Gas Co. v. City of Santa Ana*, 336 F.3d 885, 889 (9th Cir. 2003) (adopting decision of district court "as our own"). A party who does not have the burden "may rely on a showing that a party who does have the trial burden cannot produce admissible evidence to carry its burden as to the fact." Fed. R.

Civ. P. 56(c)(1)(B) (advisory committee's note). As a general rule, the "party opposing summary judgment must direct [the Court's] attention to specific triable facts." *S. Cal. Gas Co*., 336 F.3d at 889).

## 2. Product Liability

Idaho has adopted the Restatement (Second) of Torts § 402A as the basis for imposing strict liability upon the sellers of products. *Rindlisbaker v. Wilson*, 519 P.2d 421, 428 (Idaho 1974). Further, Idaho consistently has adhered to § 402A and to its accompanying comments. *Toner v. Lederle Laboratories*, 732 P.2d 297, 304 (Idaho 1987). Generally speaking, there are three general categories of strict liability in product liability cases---manufacturing flaws, design defects, or failure to warn. *Toner*, 732 P.2d at 306 (Idaho 1987); *Mortensen v. Chevron Chemical Co*., 693 P.2d 1038, 1041 (Idaho 1984).

Whether a cause of action is based upon negligence or strict liability, the plaintiff must show that (1) the product in question was defective, (2) the defect existed at the time the product left the manufacturer's control, and (3) that the defective product was the proximate cause of the plaintiff's injuries. *Pucket v. Oakfabco, Inc*., 979 P.2d 1174, 1179 (Idaho 1999) (citing *Corbridge v. Clark Equip. Co*., 730 P.2d 1005, 1007 (1986)); *Mortensen*, 693 P.2d at 1041 (citing Restatement § 402A as the basis for finding strict liability for a manufacturing, design defect, or failure to warn) *Farmer v. Internat'l Harvester Co*., 553 P.2d 1306, 1310 (Idaho 1976) (elements of prima facia case are the same regardless of negligence theory or strict liability theory). A manufacturer has a duty to design its product "so as to eliminate unreasonable risks of foreseeable injuries."

*Zimmerman v. Volkswagen of America, Inc.*, 920 P.2d 67, 70 (Idaho 1996). Similarly, a product is defective when it exposes a user or bystander to an unreasonable risk of physical injury. *See Rindlisbaker v. Wilson*, 519 P.2d 421 427-28 (Idaho 1974).

### A. *Evidence of Defect*

Determining whether a product is defective is generally left to the trier of fact. *Complaint of Diehl*, 610 F.Supp. 223, 226 (Idaho 1985). But, where "the facts are undisputed and only one conclusion may be reasonably drawn from them, these determinations become questions of law." *Id.*

Circumstantial evidence may be used to determine whether a product is defective. "While direct evidence of identifiable defect is the strongest evidence of a product's defective condition, such evidence of a defect in a product which was present when it left the manufacturer's control will be rare and unusual." *Stanley v. Lennox Industries, Inc.*, 102 P.3d 1104, 1107 (Idaho 2004). And, "a plaintiff need not prove a specific defect to carry his burden of proof." *Id.* (emphasis added); *see also Murray v. Farmers Ins. Co.*, 796 P.2d 101, 104 (Idaho 1990). Rather, evidence of malfunction can be circumstantial evidence of a defective condition. *Mortenson v. Chevron Chemical Co.*, 693 P.2d 1038, 1042 (Idaho 1984). Where the evidence of malfunction is circumstantial in nature, the claimant must be able to exclude the possibility of other reasonably likely sources. *Id.*

In other words, if the plaintiff cannot prove that a specific defect caused the accident, it will suffice if it can be shown that the product malfunctioned, and that there are no other reasonably likely causes of the malfunction. This showing leads to the

inference that some defect caused the malfunction, and satisfies the plaintiff's burden of proof. *Murray*, 796 P.2d at 104.

Here, Sabo contends that the flashlight malfunctioned due to a defect that caused the battery to vent and the flashlight to explode. The explosion of the flashlight itself is the circumstantial evidence of malfunction. Flashlights normally do not spontaneously combust while in the off position in one's pocket. Therefore, to prove that the product was defective, Sabo must demonstrate that the flashlight exploded and that there is no other reasonable explanation other than a manufacturing defect for the flashlight to explode.

Fiskars concedes that the cause of the battery venting was due to a short circuit caused by a loose screw bridging the positive terminal of the battery to the negative body of the flashlight, and that the improper insertion of the holding screw caused the incident. Def. Mem. at 17 (Dkt. 66-1). But, Fiskars contends that Dr. Levy's opinions on the subject lack foundation because he (1) is not an expert regarding flashlight design or manufacture; (2) did not review the flashlight design documents; (3) could not determine the forces the flashlight was designed to withstand before the screw could come loose; (4) had not tested other screws in similar flashlights; and (5) could not rule out that Sabo, or someone else, tampered with the screw. Therefore, Fiskars argues that Dr. Levy could not rule out other plausible scenarios where the screw might have come loose after leaving the factory, and was merely speculating that the defect existed at the time of manufacture.

Fiskars' criticisms of Dr. Levy's experience go too far at this stage. With regard to Fiskars' objections one through four, above, Fiskars essentially argues that Dr. Levy is

not an expert in flashlight design. But if an expert has the education or background to permit him to analyze a given set of circumstances, he can, through his reasoning process from known scientific principles, make himself an expert even though he has not had actual practical experience in flashlight design or manufacture. *See Gardner v. General Motors Corp.*, 507 F.2d 525, 528 (10th Cir. 1974) (expert should not be required to satisfy an overly narrow test of his own qualifications). Further, these objections apply to the weight the fact finder may attach to Dr. Levy's opinions.

Second, Dr. Levy does not need to rule out at this juncture that someone else may have tampered with the screw. There is no evidence in the record that Sabo (1) disassembled the flashlight; (2) dropped the flashlight; (3) used it improperly; or (4) otherwise tampered with the flaslight upon receiving it some two weeks prior to the incident. Absent such evidence, and construing the evidence in the record in favor of Sabo, the non-moving party, an inference can be made that the screw was loose upon leaving the factory. In other words, the inference goes both ways. Dr. Levy simply could not definitely say one way or the other that the screw was tampered with. The evidence, or lack thereof, is for the jury to construe, not the Court to construe upon summary judgment. Again, Fiskars' objection applies to the weight ultimately given by the trier of fact to Dr. Levy's opinions. It is for the jury to decide how the evidence is to be construed.

The Court makes one further observation. To demonstrate that a malfunction occurred, a plaintiff typically relies upon circumstantial evidence and the inferences arising from that evidence based upon expert testimony about the condition of the

product after the accident. *Stanley v. Lennox Industries, Inc.*, 102 P.3d 1104, 1107 (Idaho 2004). But "a malfunction may be established based on the testimony of the user alone, without the benefit of expert testimony." *Murray v. Farmers Ins. Co.*, 796 P.2d 101, 228–29 (Idaho 1990). "[A]n integral part of the proof involves negating other reasonable causes of the accident." *Id.*

Here, even absent expert testimony on the actual cause of the battery venting, the fact exists that flashlights do not normally combust or explode. The expert testimony elicited from Dr. Levy and the others who examined the flashlight determined that a loose screw was the likely culprit. There is no evidence in the record indicating Sabo, or anyone else, used the flashlight improperly. Fiskars deposed Sabo, and had an opportunity to ask that question. Noticeably, Fiskars did not support its motion with any testimony on the subject of tampering or misuse by Sabo. Sabo stated he opened the sealed package, inserted the batteries, and used the flashlight a handful of times before it exploded.

Under the facts before the Court, it is not beyond the experience of the average layperson to conclude that a loose screw inside a flashlight may cause the battery to combust in a new flashlight purchased just a few weeks earlier. A reasonable jury could so find. *See Massey v. Conagra Foods, Inc.*, --- P.3d ---, 2014 WL 2735239 *3-4 (Idaho June 17, 2014) (holding that when circumstantial evidence is presented, it is for the trier of fact to determine and infer the existence of a defect, which may be established solely upon the testimony of the user of the product).

Accordingly, there exist material issues of disputed fact on the first element of Sabo's prima facie case.

## B. *Causation*

Causation is an essential element of a product liability case. *See Stephen v. Ford Motor Co*., 134 Cal.App.4th 1363, 1373, 37 Cal.Rptr.3d 9 (2005). If "the complexity of the causation issue is beyond common experience, expert testimony is required to establish causation." *Id.* An expert's opinions and conclusions which are based on nothing more than speculation do not constitute substantial evidence. *See id.*; *see also Leslie G. v. Perry & Associates*, 43 Cal.App.4th 472, 487, 50 Cal.Rptr.2d 785 (1996) ("[w]here an expert bases his conclusion upon ... factors which are speculative, remote or conjectural, the expert's opinion cannot rise to the dignity of substantial evidence."). *Pierson v. Ford Motor Co.*, 445 Fed. Appx. 966 (9th Cir. 2011). Causation must be established "with reasonable probability, not mere possibility." *Lundstrom v. Brekke Enterprises, Inc.*, 765 P.2d 667, 673 (Idaho 1988).

Fiskars raises two objections to Sabo's causation evidence. First, Fiskars argues there is no objective evidence that any particular harmful solvents or chemicals were released from the flashlight as a result of the battery venting event. Fiskars contends that Dr. Spingarn's report in this regard was inconclusive, because he found evidence of soap, but no other chemicals, on Sabo's glasses, and he did not test for chemicals on the outside of the flashlight. Accordingly, Fiskars argues that it was mere speculation by Dr. Spingarn to conclude that anything escaped the flashlight, let alone harmful chemicals.

Fiskars overlooks the evidence in the record. Sabo, his wife, and Camille Lang witnessed the event. All three of them describe a smoke or haze surrounding Sabo after hearing the explosion. Lang swept up glass shards from the floor. And Sabo's glasses were scratched. Lang noted that Sabo's eye appeared red after the incident. Branko Tuskan stated he did not see smoke or observe redness around Sabo's eye. Fiskars argues that the Court should not grant "any credibility" to the eyewitness accounts other than that of Mr. Tuskan.[5] But the Court does not decide credibility upon summary judgment. It will be up to the jury to weigh the credibility of the four witnesses who described the incident, three of whom claim they observed smoke surrounding Sabo after the explosion.

Dr. Spingarn described the contents of the battery, and explained in his report that contact of the battery contents with the eye would result in severe damage. That he does not know precisely which chemical components escaped or produced the damage is irrelevant. Sabo, and two other witnesses, describe seeing gas escaping, and saw the redness around Sabo's eye. Sabo experienced pain, enough so that he visited the emergency room when his symptoms did not improve after washing out his eye and waiting for two days.

As for the soap on the glasses, an equally probable explanation at this juncture is that Sabo washed his glasses so he could continue to wear them. There is no evidence negating this inference. Again, the absence of evidence regarding what happened with the glasses after the incident but before Dr. Spingarn tested them is glaring. The Court is not

_____

[5] Fiskars included the deposition testimony of Branko Tuskan, but not the testimony of either Camille Lang, or Maria Sabo, in its submissions.

the trier of fact—the jury is, and it will be for the jury to decide what weight, if any, should be given to the absence of any chemicals on the outside of the glasses, or Dr. Spingarn's failure to test the exterior of the flashlight.

The second objection Fiskars raises is the alleged lack of evidence to support the conclusion that Sabo's trigeminal neuralgia was caused by or related to his exposure to the battery contents on September 12, 2009. Fiskars points to the medical evidence, especially the records of Dr. Russo who treated Sabo in the emergency room on September 14, 2009, two days after the incident. Dr. Russo did not note objective evidence of trauma or injury to Sabo's left eye. Further, it was not until four months later, in January of 2010, that Sabo's condition worsened, after he had continued welding. Reports in the medical records indicated he informed his doctors of UV exposure due to welding. Finally, Fiskars argues that Dr. Aizuss, an ophthalmologic expert, could not say with medical certainty that Sabo's current condition was caused by the battery content exposure. Fiskars raises the same objection with regard to Dr. Kowell's opinion, arguing it is speculative and based merely upon the timing and sequence of events rather than any objective medical evidence.

The lack of objective medical evidence is not enough to negate the other reasonably plausible inference based upon Sabo's subjective complaints of pain and the opinions of his treating physicians based upon those subjective complaints. Sabo complained of pain immediately after the incident. He washed his eye out. Perhaps believing the pain would subside, he waited to visit the emergency room. Two days is not unreasonable. Upon his visit to the emergency room, Sabo complained of left eye pain.

Dr. Russo had no reason to disbelieve Sabo's subjective account of his symptoms. And, although there is trauma reported in his medical history, just two days prior to the incident an eye exam reported no abnormal findings. *See Dodge-Farrar v. Am. Cleaning Servs. Co., Inc.*, 54 P.3d 954, 958 (Idaho Ct. App. 2002) (layperson can testify to the causation of medical symptoms or of injuries if it is within the usual experience of the average layperson, such as falling down and hurting a knee).

Sabo continued to complain of pain to his doctors, Dr. Corben and Dr. Hopkins, in September of 2009. Neither physician had reason to disbelieve Sabo's subjective complaints of pain despite a lack of objective findings. Dr. Hopkins did note objective findings of tear film debris on the left eye.

Findings of abnormal tearing were again noted by Dr. Buckland on January 6, 2010, along with other subjective complaints such as light sensitivity, headache, and double vision. There is evidence in the record that Sabo may have suffered UV exposure from welding between September 2009 and January 2010, but Dr. Toyama, who examined Sabo, is of the opinion that the abnormal tearing in Sabo's left eye was consistent with a chemical gas injury. Tearing is noted consistently as abnormal in the left eye. Further, there is no other reasonable explanation in the medical record explaining why Sabo's left eye is worse than his right eye, even after the alleged UV exposure. Dr. Toyama believes the battery fumes likely caused Sabo's left eye to be more sensitive to injury and hypersensitive to external agents.

Based upon Sabo's subjective complaints and the objective medical evidence of record, it appears Sabo's retained experts, Drs. Kowell and Aziuss, are prepared to testify

that the chemical gas exposure from the battery venting on September 12, 2009, caused some injury to Sabo's left eye to a reasonable degree of medical probability. *Slack v. Kelleher*, 104 P.3d 958, 966 (Idaho 2004) (requiring expert medical testimony to a reasonable degree of medical probability). It is not for the Court to second guess Sabo's credibility at this juncture, or discredit his subjective complaints of pain and the accounts he gave to his treating physicians and the experts that ultimately relied on those accounts. The jury can sort this out at trial.

### C. *Damages*

Finally, Fiskars attacks Mr. Schulze's assumption that Sabo will no longer be able to weld as the foundation for the damage calculation. Fiskars argues Sabo has not introduced any expert report linking Sabo's medical condition with an inability to perform welding work. Fiskars contends the Court may not rely upon Sabo's testimony that he can no longer weld, because he is a layperson. Rather, Fiskars asserts that Sabo must introduce vocational expert testimony. Without that, Fiskars argues the Court may not rely upon Mr. Schulze's damage calculations and Sabo has not proven damages in the form of future lost earnings.

In Idaho, "damages for lost earnings in the future must be shown with reasonable certainty and compensatory awards based on speculation and conjecture should not be allowed." *Warren v. Furniss*, 861 P.2d 1219, 1224–25 (Idaho Ct. App.1993). Speculative evidence offered to satisfy the "reasonable certainty" element of future lost earnings is inadmissible. *Rindlisbaker v. Wilson*, 519 P.2d 421, 430 (Idaho 1974). To show future lost earnings with reasonable certainty, the claimant must prove the extent to which her

future earning power was impaired. *Long v. Hendricks*, 705 P.2d 78 (Idaho Ct. App.1985).

In *Bailey v. Sanford*, 86 P.3d 458 (Idaho 2004), the court permitted the plaintiff to testify about her annual salary as a court reporter and that her back injuries suffered from an accident precluded her from sitting for long periods. The plaintiff testified that her job as a court reporter required her to sit for long periods, aggravating her condition. The court also permitted the plaintiff's friends, family and supervisor to testify that the plaintiff's back injuries prevented her from performing daily activities. This lay testimony, combined with evidence of the plaintiff's age, life expectancy, and the amount of her wages, was sufficient for the court to submit the issue of future wage loss to the jury. 86 P.3d at 465.

Here, Sabo contends he can no longer work as a welder, his primary (and most lucrative) occupation, because the dust, fumes, heat, and other environmental conditions aggravated his left eye and exacerbated other symptoms from the battery venting. Sabo provided evidence of his earnings from welding. Mr. Schulze then analyzed that evidence, including Sabo's tax returns, and arrived at a damage calculation based upon Sabo's earnings and expected years to retirement. Sabo's evidence is no different than the evidence in *Bailey* the court found was properly submitted to the jury on the issue of future wage loss.

Further, Mr. Schulze's report did not cover medical costs, costs of rehabilitation, or other costs related to the injury, which are components of damages. *See Bailey v. Sanford*, 86 P.3d at 465 (finding the defendant could not ignore, as a component of

damages, medical treatment bills, physical therapy, and Pilates instruction the plaintiff received after the accident and which she would continue to receive so long as she suffered back pain). Although Fiskars contends that Sabo cannot prove lost earnings, Fiskars cannot ignore that Sabo may have other elements of damages to which he is entitled to prove. No argument or evidence was offered on this point. However, it is a reasonable inference for the Court to make, given the extent of Sabo's medical history, that his medical treatment bills may constitute an element of his damages.

Defendant has not carried its burden to show an absence of disputed material fact on the issue of damages.

### 3.     Evidentiary Objections

Fiskars raised multiple  evidentiary objections in the form of serial motions to strike, as well as an objection to Sabo's request for judicial notice filed in conjunction with Sabo's memorandum in opposition to the motion for summary judgment.

Rule 56 of the Federal Rules of Civil Procedure does not endorse motions to strike. Cmt., 2010 Amendments. Rather, subdivision (c)(2) provides that a party may object that material cited to support or dispute a fact "cannot be presented in a form admissible in evidence." The objection is akin to an objection made at trial, and there is no need to file a separate motion to strike.

The serial motions have prolonged the Court's review of the motion for summary judgment. Often, the parties argued about substantive issues that were, or could have been, raised in the motion. The motions were superfluous, unnecessary, and detracted from the substantive issues before the Court, as explained above and further below.

The first motion to strike (Dkt. 68) objects to certain aspects of the opinions of Roy Toyama, M.D., Donald Chisholm, M.D., and Arthur Kowell, M.D., Ph.D. All three physicians rendered an opinion that Sabo could not safely perform his work as a welder, and that he would not be able to work as a result of symptoms after the flashlight incident. Mem. at 2 (Dkt. 68-1). Dr. Kowell's opinion included a statement that Sabo was permanently disabled.

The Court did not rely upon these aspects of the opinions of Drs. Toyama, Chisholm, and Kowell. Rather, Sabo presented sufficient evidence in opposition to the motion for summary judgment based upon his own testimony to create a genuine issue of disputed fact regarding the extent to which he can or cannot work.

Fiskars' second motion to strike (Dkt. 79) objects to certain of Sabo's submissions in opposition to the motion for summary judgment. Specifically, Fiskars complained that portions of the declarations of Dr. Arthur Kowell, Dr. Samuel Levy, Dr. David Aizuss, and Dr. Neil Spingarn lacked foundation, were not properly disclosed as part of Sabo's expert witness disclosure, and contained speculation. Other declarations, such as the declaration of Fred Cutler, and portions of the declaration of Mark Polland, were objected to on the grounds that Cutler's testimony was not timely disclosed, and that exhibits attached to Polland's declaration are offered as hearsay without proper foundation. The Court did not rely upon any portion of the declarations to which Fiskars objects. To the extent Fiskars contends the experts may not testify at trial to the opinions expressed in the declarations, Fiskars can raise those issues before the trial judge.

The final objection contained in Fiskars' second motion to strike concerns Sabo's declaration, specifically portions of paragraphs 2, 3, 6, 7, 8, and 10, as well as Sabo's assertions that it is impossible for him to work as a welder. The Court already discussed that Sabo can testify about his ability to work, based upon the holding in *Bailey v. Sanford*, 86 P.3d 458 (Idaho 2004). As to the objectionable portions of the other cited paragraphs, the Court did not rely upon Sabo's testimony regarding what others observed or relayed to him regarding his eye condition, the accident, or his welding work. The Court obtained the facts regarding those issues from the percipient witnesses, either through their deposition testimony, the medical records, or expert reports.

Fiskars' third motion to strike (Dkt. 81) objects to the declaration of Dr. Chisholm, which Sabo filed in opposition to Fiskars' first motion to strike. Because the Court did not need to resolve the first motion to strike, this motion is denied.

Lastly, Fiskars in its reply memorandum in support of its motion for summary judgment objected to Sabo's motion to take judicial notice of the Administrative Law Judge Donna Shipps' January 17, 2013 Order and Decision regarding Sabo's application for social security benefits. In that decision, ALJ Shipps determined that Sabo's medical impairments, for purposes of his application for social security disability benefits, so narrowed the range of work Sabo might otherwise perform that a finding of disabled was appropriate under the applicable Medical-Vocational Guidelines. Fiskars argues that the Court may not take judicial notice of the decision in a contested civil proceeding.

The Court did not rely upon the ALJ's decision. Regardless, Fiskars is not correct. It is entirely proper for this Court to take judicial notice of an administrative law judge's

decision. *See Transmission Agency of N. Calif. v. Sierra Pac. Power Co.*, 295 F.3d 918, 924 n.3 (9th Cir. 2002) (taking judicial notice of an administrative law judge's decision in ongoing litigation under Fed. R. Evid. 201(a) and (b), because neither the existence of the opinion nor its contents were in dispute.). The objection to Sabo's request for judicial notice is overruled, and Sabo's request is granted.

## CONCLUSION

Fiskars attempts to prove its case for summary judgment on the absence of facts sufficient to support Sabo's prima facie case. But there are facts in the record which a reasonable jury could believe, and which support the elements of Sabo's prima facie case. The facts are, to a large degree, based upon Sabo's subjective complaints of pain, eyewitness accounts of the September 12, 2009 incident, and medical diagnoses that rely upon those accounts. It is not for the Court to weigh those opinions, however, or decide credibility upon a motion for summary judgment.

Fiskars in its serial motions to strike raises evidentiary issues more properly considered by the trial judge prior to or during trial. The Court did not rely upon any of the evidence submitted by Sabo that Fiskars objected to in its motions to strike. There was sufficient evidence in Fiskars' moving materials for the Court to decide the summary judgment motion. Therefore, the motions to strike will be denied, without prejudice to raise the same issues prior to or during trial.

## <u>RECOMMENDATION</u>

**NOW THEREFORE IT IS HEREBY RECOMMENDED:**

1)     Defendant's Motion for Summary Judgment (Dkt. 66) be **DENIED**.

2)     Defendant's Motion to Strike (Dkt. 68) be **DENIED** without prejudice to renew its objections at trial.

3)     Defendant's Motion to Strike (Dkt. 79) be **DENIED** without prejudice to renew its objections at trial.

4)     Defendant's Motion to Strike (Dkt. 81) be **DENIED**.

Written objections to this Report and Recommendation must be filed within fourteen (14) days pursuant to 28 U.S.C. § 636(b)(1) and Dist. Idaho L. Rule 72.1(b), or as a result of failing to do so, that party may waive the right to raise factual and/or legal objections to the United States Court of Appeals for the Ninth Circuit.

**IT IS FURTHER ORDERED** that the hearing scheduled for August 20, 2014, on the above motions is **VACATED.**

Dated: July 31, 2014

Honorable Candy W. Dale
United States Magistrate Judge